## AFFIDAVIT

**STATE OF WEST VIRGINIA**

**COUNTY OF CABELL, to-wit:**

I, Sean McNees, being first duly sworn, do hereby depose and state as follows:

### INTRODUCTION

1)   I am a Special Agent with the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) and have been since January 2016. I am currently assigned to the ATF Louisville Field Division, Charleston, West Virginia Field Office.

2)   The facts in this Affidavit come from my personal observations, my training and experience, and information obtained from other agents, law enforcement officers, and witnesses.

3)   Because this Affidavit is being submitted for the limited purpose of securing a search warrant, I have not included each and every fact known to me concerning this investigation. I have set forth only the facts that I believe are necessary to establish probable cause for this warrant.

### STATUTORY AUTHORITY

4)   This affidavit is made in support of a search warrant for 1200 28th Street, Apartment 4, Huntington, West Virginia 25705, and appurtenances thereto (hereinafter "the target residence"), which is further described in Attachment A, in which I believe there is probable cause that evidence of violation of Title 21, U.S.C §

1

841(a)(1), distribution of methamphetamine and fentanyl and possession with intent to distribute methamphetamine and fentanyl will be located. The target residence is an apartment located on south side of the second floor of the building located at 1200 28th Street, Huntington, West Virginia 25705. The information detailed in this affidavit is based upon my investigation into Kenard MOORE (hereinafter "MOORE"). The events described in this affidavit occurred in Cabell County, West Virginia and within the Southern District of West Virginia.

**AFFIANT'S TRAINING AND EXPERIENCE**

5)     Your Affiant is currently employed as a Special Agent with the ATF. Your Affiant graduated from the Federal Law Enforcement Training Center, where I learned basic criminal investigation techniques. In addition, I graduated from the ATF National Academy, where I learned about federal firearms laws, federal explosives laws, bomb scene investigations, and arson investigations.

6)     Your Affiant has received investigative training, conducted, and participated in investigations of violations of federal criminal laws, including those relating to firearms and controlled substances. These acts commonly involve the criminal use and transfer of firearms, illicit drug trafficking, acts of arson, criminal possession, or use of explosives, and/or destructive devices.

7)     In my current position as an ATF Special Agent assigned to the Charleston, West Virginia Field Office, my primary responsibilities include investigating individuals or groups who have committed violations of the federal firearms and narcotics laws. Within that role, my job duties include, but are not limited to:

      a. Functions as a case agent, which entails the supervision of specific investigations.

      b. Interviewing witnesses relative to the illegal trafficking of drugs and firearms and the distribution of monies and assets derived from these illegal acts.

      c. Functioning as a surveillance agent observing and recording movements of persons trafficking in drugs and firearms and those suspected of trafficking in drugs and firearms.

      d. Drafting, obtaining, and executing search warrants.

## PROBABLE CAUSE

8)     In September of 2023, investigators with the ATF and Huntington Police Department received information from a confidential informant (hereinafter "CI"), who has previously provided corroborated information regarding drug trafficking in this district, that MOORE was supplying narcotics, including fentanyl and methamphetamine, to individuals in the Huntington, West Virginia area, and had been doing so for several months. The

3

CI identified the target residence as the location that MOORE resides at and frequently distributes narcotics from.

9)    A check of West Virginia Department of Motor Vehicle records showed that MOORE utilized the target residence as his registered address on his West Virginia driver's license.

10)   The CI also provided investigators with a phone number for MOORE. A subsequent record check on the phone number showed that MOORE was the registered subscriber. The CI communicated with MOORE at this telephone number on numerous occasions throughout the investigation.

11)   A review of criminal history records for MOORE showed that on or about October 28, 2009, in Cabell County, West Virginia Circuit Court, MOORE was convicted of the felony offense of malicious wounding and is thus, prohibited from possessing a firearm. As part of this investigation, investigators believe MOORE was in possession of a firearm on September 29, 2023, when investigators utilized the CI to conduct a controlled purchase of a Colt, model police positive, .38 caliber revolver from MOORE, which is further described below in paragraphs 17 and 18.

12)   On September 7, 2023, investigators utilized the CI to conduct a controlled purchase of a quantity of suspected fentanyl from MOORE from inside the target residence. Prerecorded official law enforcement funds were used to conduct the controlled purchase. During a debrief of the CI, the CI stated MOORE was the person

with whom he/she conducted the purchase. The controlled purchase was audio and video recorded. The CI subsequently provided the purchased substance to investigators and the substance field tested positive for the presence of fentanyl, a Schedule II controlled substance. Your affiant also later reviewed the controlled purchase video. MOORE's face was not visible on the video, but his body was partially visible. He was also wearing a t-shirt with a distinct design on it. Investigators observed him wearing a t-shirt with the same design on it at a later date in the investigation.

13) On September 13, 2023, investigators utilized the CI to conduct a controlled purchase of a quantity of suspected fentanyl from MOORE. Prerecorded official law enforcement funds were used to conduct the controlled purchase. On this occasion, MOORE advised the CI to meet him at a residence just south of the target residence. The CI then drove to the target residence and observed MOORE standing on 28th Street close to a green in color residence. The area where MOORE was standing was approximately 150 feet away from the target residence. MOORE then approached the CI's vehicle and distributed a quantity of suspected fentanyl to the CI. During a debrief of the CI, the CI stated MOORE was the person with whom he/she conducted the purchase. After the CI returned to investigators, MOORE was observed by investigators standing on the landing at the top of a staircase on the front side of 1200 28th

Street. The staircase can be utilized to access an entryway that leads to the target residence. The CI provided the purchased substance to investigators and the substance field tested positive for the presence of fentanyl. Your affiant also reviewed the controlled purchase video and was able to identify MOORE in the video.

14)   On September 28, 2023, investigators utilized the CI to conduct a controlled purchase of a quantity of suspected fentanyl and suspected methamphetamine from MOORE behind the target residence. During this occasion, the CI went to the target residence and then MOORE sent the CI a text message that stated "pull out back of the apt." The CI then parked his/her vehicle behind the target residence. MOORE was then observed exiting from the rear of the building. He exited from the only second floor exterior door on the rear of the building and utilized the staircase to then walk to the CI's vehicle.

15)   Similarly, to the exterior second floor door on the front side of the apartment building, the exterior second floor door on the rear side of the apartment building also leads to an entryway that can be utilized to access the target residence.

16)   Once MOORE met with the CI, the CI provided MOORE with prerecorded official law enforcement funds and received a quantity of suspected fentanyl and a quantity of suspected methamphetamine from MOORE. MOORE was then observed going back up the rear second

6

floor staircase and entering the building. During a debrief of the
CI, the CI stated MOORE was the person with whom he/she conducted
the purchase. The CI subsequently provided the purchased
substances to investigators and the substances field tested
positive for the presence of fentanyl and methamphetamine, both
Schedule II controlled substances. The controlled purchase was
audio and video recorded. Your affiant reviewed the controlled
purchase video and was able to identify MOORE in the video. The CI
can also be heard in the video asking MOORE if he had any "guns"
for sale. MOORE told the CI to come see him the following day and
added that he had them "stashed" at a residence nearby.

17)   On September 29, 2023, investigators utilized the CI to
conduct a controlled purchase of a Colt, model police positive,
.38 caliber revolver from MOORE. During this occasion the CI went
to the target residence and approached MOORE who was on foot behind
the target residence. MOORE seemed confused as to why the CI was
there. The two talked briefly and the CI then left the area and
returned to investigators. Surveillance continued on MOORE and
after MOORE spoke with the CI, he was observed going up the rear
second floor staircase and entering the rear second floor exterior
door of his apartment building.

18)   The CI then contacted MOORE over the phone and explained
that he/she wanted to purchase a firearm. MOORE advised that he
could obtain a ".38" that was a "police edition" for the CI. A few

7

minutes later, the CI returned to the area in front of the target residence and met with MOORE. The CI provided MOORE with prerecorded official law enforcement funds. MOORE then instructed the CI to go to 905 Madison Avenue in Huntington, West Virginia and advised that the CI could obtain the firearm there. The CI then went to that location and waited there for several minutes. MOORE then communicated with the CI through multiple telephone calls and advised the CI to return to the area of the target residence. MOORE told the CI that he had placed the firearm inside of a barbeque grill at the bottom of his apartment building's rear staircase. The CI went to that location and located the firearm in a barbeque grill along with multiple rounds of firearm ammunition. The CI returned to investigators and turned over the purchased firearm and ammunition. The controlled purchase was audio and video recorded. Your affiant reviewed the controlled purchase video, and MOORE's face was not visible on the recordings. However, during the first interaction the CI had with MOORE, investigators captured photographs of MOORE meeting with the CI. During a debrief of the CI, the CI stated MOORE was the person with whom he/she conducted the purchase.

19)   Later in the day on September 29, 2023, MOORE contacted the CI via text message and advised that he had an "ar" for sale. The CI and your affiant understood this to be a reference to an AR-15 style rifle. Additionally, MOORE agreed to sell the CI an

8

amount of fentanyl.

20) On October 3, 2023, investigators utilized the CI to conduct a controlled purchase of a quantity of suspected fentanyl from MOORE. Prerecorded official law enforcement funds were used to conduct the controlled purchase. On this occasion the CI drove to the target residence and parked behind the apartment building. MOORE was then observed exiting from the rear second floor exterior door of the apartment building and walking down the staircase to meet the CI. MOORE then approached the CI's vehicle and distributed a quantity of suspected fentanyl to the CI. He also placed a large zip up black in color bag in the trunk of the CI's vehicle. During a debrief of the CI, the CI stated MOORE was the person with whom he/she conducted the purchase. The CI subsequently provided the purchased substance to investigators and the substance field tested positive for the presence of fentanyl. The item in the large bag that was supposed to be an "ar" style rifle, turned out to not be a firearm, and was in fact a BB gun. Your affiant also reviewed the controlled purchase video and was able to identify MOORE in the video.

21) On December 27, 2023, the CI conducted a recorded telephone call to MOORE. The CI asked MOORE if he/she could still obtain "food" from him. MOORE advised that the CI could. The CI then asked if he/she could get an "ounce" the following day. MOORE stated that he just got a new "batch" in. The CI asked MOORE if he

9

wanted the CI to meet him at "your apartment on 28th" or a different location. MOORE responded that the CI should come up to "28". He then asked when the CI would be coming, and the CI stated that it would be the following day.

22) The CI and your affiant understood MOORE's reference about coming to "28" to be an instruction from MOORE to meet him at the target residence the following day. Your affiant also knows the street term of "food" to be a common term used for heroin/fentanyl.

23) At approximately the same time that the CI was communicating with MOORE during the recorded telephone call on December 27, 2023, MOORE was observed by investigators on recorded video surveillance utilizing his cellphone and standing on the landing at the top of the staircase on the front side of his apartment building located at 1200 28th Street.

24) On December 28, 2023, MOORE sent a text message to the CI that stated "Gm what time should I be ready for u ?". The CI responded that they would text him when he/she was ready. MOORE then sent two additional text messages to the CI that stated, "Ok how much u gone need ?" and "the stuff I got has Feiny all threw it so you can Put a higher price".

25) The CI and SA McNees understood "Feiny" to be a reference to fentanyl.

26)   This affidavit is intended to show that there is probable cause for the requested search warrant and does not purport to set forth all my knowledge of, or investigation, into this matter.

22) I am seeking authorization to search the target residence which I believe to be currently involved in the trafficking of narcotics.

23)   Based on my training, experience, and conversations with other law enforcement officers, I know that narcotics traffickers will typically come from, or return to, a location where they keep their supply of narcotics and proceeds from the sale of the narcotics, before or after meeting with a confidential informant. I am also aware that drug traffickers generally store their narcotics and drug-related paraphernalia in their residences, vehicles, or places of safe haven for extended periods of time. Further, drug traffickers generally maintain records relating to their drug trafficking activities in their residences or the curtilage of their residences. Because drug traffickers often "front" (that is, sell on consignment) controlled substance to their customers, or alternatively, will be "fronted" controlled substances from their suppliers, such record keeping becomes necessary to keep track of amounts paid and owed, and drug traffickers typically maintain these records close at hand to readily ascertain current balances. Often, drug traffickers keep "pay and owe" records to show balances due for drug payments in

the past ("pay") and for payments expected ("owe") to and from the trafficker's supplier and the trafficker's dealers. Additionally, drug traffickers typically maintain telephone and address listings of customers and suppliers and keep them immediately available so that they can efficiently conduct their drug trafficking business.

24)  It is also a common practice for traffickers to conceal large sums of money, either the proceeds from drug sales or monies to be used to purchase controlled substances, at their residences. In this connection, drug traffickers typically use wire transfers, cashier's checks, and money orders to pay for controlled substances. Drug traffickers also typically maintain evidence of such financial transactions and records relating to income and expenditure of money at their residences or the curtilage of their residence or vehicles.

25)  Typically, drug traffickers possess firearms and other dangerous weapons at their residences or vehicles to protect their profits, supply of drugs, and themselves from others who might attempt to forcibly take the trafficker's profits or supply of drugs.

26)  I know that computer hardware, software, and electronic files may be important to a criminal investigation because the objects themselves may be contraband, evidence, instrumentalities, or fruits of crime in the form of electronic data. Rule 41 of the Federal Rules of Criminal Procedure permits the government to

search for and seize computer hardware, software and electronic files that are evidence of crime, contraband, instrumentalities of crime, and or fruits of crime. In this case, the warrant application requests permission to search and seize records and documents relating to the trafficking of the substances identified in this investigation. These records constitute evidence of crime. This affidavit also requests permission to seize the computer and cellphone hardware that may contain these records if it becomes necessary for reasons of practicality to remove the hardware or cellphones and conduct a search offsite. I believe that, in this case, the computer hardware or cellphones are a container for evidence and an instrumentality of the crimes under investigation.

27) I know that cellular telephones are important to a criminal drug investigation because cellular telephones may be evidence or instrumentalities of crime, and/or may be used as storage devices that contain evidence of crimes in the form of electronic data. In this case, the warrant application requests permission to search and seize records relating to the trafficking of the substances identified in this investigation. These records constitute evidence of crime. I also request permission to seize the cellular telephones that may contain these records and search the memory of the cellular telephones. I believe that, in this case, cellular telephones (including saved voice mails, data files, photo and video files, and text messages) are a container

13

for evidence and instrumentalities of the crimes under investigation.

28) My awareness of these drug trafficking practices, as well as my knowledge of drug use and distribution techniques as set forth in this Affidavit, arises from the following: my involvement in prior drug investigations and searches during my career as a law enforcement officer, as previously described; my involvement on a number of accessions in debriefing confidential informants and cooperating individuals in prior drug investigations, as well as what other agents have advised me when relating the substance of their similar debriefings and the results of their own drug investigations; and other intelligence information provided through law enforcement channels.

29) In a number of residential searches and vehicle searches in prior investigations that I have been involved in, the types of evidence identified in Attachment "B" have typically been recovered from the main residence and from other structures and vehicles in areas on the properties being searched, for example, other storage lockers/areas, detached closets, containers, and yard areas associated with the main residence and used in connection with or within the curtilage of said residence (including vehicles that are maintained and stored on the curtilage of a main residence).

30)     Further, your affiant sayeth naught.


                                                          Sean McNees, Special Agent
                                                          ATF


SUBSCRIBED AND SWORN before me by telephonic means, this
29th day of December 2023.


                                                          CHERYL A. EIFERT
                                                          UNITED STATES MAGISTRATE JUDGE